I am James Endicott from Texas, and I am representing David Huber, an employee of the Department of Labor in Texas. We have before us today a fairly essential fact that is happening. On December the 4th of 2003, Mr. Huber's supervisor at 8.25 in the morning reported very specifically that he saw on Mr. Huber's computer at work a montage of totally nude women. The scientific evidence that is included in an Inspector General investigation does in fact show very specifically that on the same 4th of December in the afternoon beginning at 12.58 that in one second he viewed 8 pictures, in 1 minute 33 seconds he viewed 87 pictures, in 4 seconds he viewed 3 pictures, and then on the very next day, December the 5th, that in 5 seconds he viewed 16 pictures. Are you telling us that the issue is that he didn't take very much time away from his assigned duties or that these are pictures that can be digested in a blink of an eye? Respectfully ma'am, I'm saying neither. What I'm suggesting is that Mr. Huber's position in this is that all of these pictures were sent to him by third parties, that he was opening up email and these were attachments, with the exception of some scenery pictures that he admits that he did load into his own computer for what he believed was proper government use, and also some joke pictures that were sent in by other people. Mr. Huber's position is that he had no interest in these pictures. When he opened them, he just simply went on to something else. He was interested principally in pictures of motorcycles, which were... Mr. McConnell? Yes, sir. He was... the notice of removal that we know was mitigated to a suspension of 60 days. He was charged with improper use of government equipment, misuse of government equipment, specifically his computer. Yes, Your Honor. Now, theoretically, you could have misuse of government equipment on your computer if you were on a computer all day on eBay, right? But he was charged with viewing pornographic material, correct? Well, Your Honor, he was charged to be more specific, sexually-oriented and explicit material. Now, what do you say had to be... I suppose you say it had to be shown that he was on there for a long time and that it was sexually explicit. Is that your position? Your Honor, my position is very simply, the original charge against him, the removal decision, the Inspector General referral, the decision by the Merit System judge, all used the term sexually-oriented and explicit. And you're saying this was not that because it was just pictures of nude, mostly painted women in Mardi Gras and so forth? Your Honor, I would say that to rise to the level of sexually-oriented and explicit as defined in federal law, it did not rise to that. That requires actual sexual activity in more graphic detail than I would prefer to state in court. How about sexually-oriented as opposed to sexually explicit? Judge, I don't believe that is... you know, as defined in federal law, it wasn't sexually-oriented either. Why would... what would be your definition of sexually-oriented? I understand you're looking to the telepornography statute for the definition of sexually explicit. But sexually-oriented seems broader than sexually explicit, or at least broader than the definition of sexually-oriented. Your Honor, if I recall in my law school days, the famous Supreme Court case, I can't exactly cite it, but it said specifically, I'll know pornography when I see it. That's dealing with the problem of lack of definition of pornography. Sexually-oriented would seem to be... you would agree, would you not, that it's broader than sexually explicit as defined in the telepornography statute? I would suggest that's true. However, Judge, as I was going to say also, the Department of Labor policy that puts Mr. Hoover on notice of what he cannot do with his government computer similarly uses the terms sexually-oriented, sexually explicit, and does not further define it. It doesn't say... You mean to disjunct it? Yes, sir. But, you know, we have a clear federal definition of what it is. And in this case, whatever Mr. Hoover viewed, albeit for a very brief time on his computer, does not rise to that level based on the evidence that's before us here today. Mr. McCowen, you said that he had not sought out these images, but they were sent to him by somebody. Yes, ma'am. However, would not the computer expressly show that these had been forwarded from someone else? I gather that that defense wasn't credited by Hoover. Judge, I don't think there was any dispute that these were sent by third parties. Mr. Hoover stated it. The person who sent it stated it. The inspector general supported it in their inspector general report. I don't think that's a question at all, ma'am. I think it's very clear that a third party had sent in this e-mail with the attachments. I don't think, I think even the merit system judge concluded that. You're saying they found the problem was that he saved it and reviewed it? Well, Judge, I think ultimately his offense is found by the deciding officials and the judge was that he even looked at it. And we're all experienced, I think, with opening attachments to e-mails. Once you decide to open an attachment, you don't know what it might be. It might be anything. He did not remove it from his computer. Once he knew it was there, he did not get rid of it. But that's not what he was charged with. He was charged basically with viewing this sexually oriented and explicit material. And again, one of the ironies of this is the judge believed Mr. Rodriguez and she believed the scientific evidence. But the fact that the scientific evidence did not back up Mr. Rodriguez's testimony, she just totally disregarded that. If she was going to accept the computer evidence that was there, what supposedly happened that triggered this didn't happen. Mr. Hoover denied it. And the evidence does not support it. The United States Department of Labor has not given comment. This may be going over the ground. I just wanted to make sure. Yes, sir. The government has said that he reviewed some materials and went back to material already downloaded into his computer. What do you say to that? Judge, on the 5th of September, or 5th of December, he did view 16 pictures in five seconds on the second day. There's only two days in issue. One being the 4th and one being the 5th. That was material that had been received previously, just so I'm straight. Yes, sir. That's my understanding. For whatever reason, that was opened up. But that would seem to be inconsistent with the claim that he simply had no knowledge of what was in an attachment, opened it up inadvertently, in effect, and moved on. He would presumably have known what was in that. Well, Judge, respectfully, I may have misstated it. What he saw on the next day, they were different pictures. As I read the inspector general's printout, which is in your materials in more detail. Sir, you would take issue with the statement on page 14 of the government's brief. Do you have the government's brief? Well, let me read it to you. It's just one sentence. It talks about some clicking on some of the pictures and going through five or six pictures, and then they say, then he went back and looked at the same images the next day. Do you think the evidence does not support that? I will review the inspector general's, and when I read that, I'll address that. As a backup position, the government relying on this court's opinion in Farrell basically goes to the common sense approach that anybody would have known what he did was wrong. Well, again, we would urge that if we look at Farrell, we have a very inconsistent penalty. We have a government employee who does a section-oriented parody on his government computer, and that's a three-day suspension. My time is up, and I'll reserve time for rebuttal. Let me ask you, though, if I may, one question. Is your position that 60 days suspension was disproportionate to whatever it is that was wrong? Yes, ma'am. So there should be no penalty? Well, we've certainly argued no penalty, but certainly we've argued that, based on Mr. Hoover's record to this point, that 60 days was excessive, yes. Thank you, Mr. Ingram. Thank you. Mr. Court. The board here properly sustains Mr. Hoover's 60-day suspension for misusing his government computer, and that decision should be affirmed. Mr. Hoover offers three arguments here in support of this case. I'd like to talk about each of those. The first one is that Mr. Hoover claims that these photographs were not inappropriate. For that proposition, he cites the Can-Span Act, which is an act of concern, as we pointed out in our brief, with child pornography. The policy applicable here, which is in the appendix, in the joint appendix at page 107, points out clearly that, given that it is impossible to list all inappropriate uses of computers, employees are to utilize common sense and rule of reason in the personal use of government equipment. Then it goes on to clearly prohibit the use, the creation, download, viewing, storage, copying, and transmission of sexually explicit or sexually oriented materials. So Mr. Hoover takes issue with the definition of sexually explicit and sexually oriented in the sense that those terms are defined in the Can-Span Act as he claims in his brief, bestiality and that sort of thing. You referred to the Can-Span Act. Are you talking about the Sexual Exploitation of Children Act, the child pornography statute? I think so. It's in U.S.C. 2051-56, right? Yes, I think I made that objection. But actually, that's Can-Span Act. OK, I'm sorry. It was in the amendment to it. OK, I'm sorry. It was called in the record. I'm sorry if I'm confused about that. But the point is that act doesn't apply. The point is that a common sense definition of what is sexually explicit or sexually oriented is what applies here in the workplace. And if we use the definition that's contained in that statute, that would allow quite a lot of material that is not explicitly pornographic to be displayed in the federal workplace. And that's just inappropriate. It's common sensical. It's not that difficult. Is it your position that all of the photographs or the reproductions from the computer that are in the appendix, the red appendix, are sexually oriented? No, it's not. I think that there were some. There's a range. You can look at them, and there's a range there. Not all of them, I would think, are sexually oriented. Some of them are just women wearing all of their clothes, and there's nothing inappropriate about that. But many of them are certainly sexually oriented. What about the ones that people have painted? Some of them. Some of them. The ones that are painted. It's a judgment point. The ones that are painted, when there's only a layer of paint covering a person's body, is that sexually oriented or not? I think it is. Well, you have to explore. What would have been the situation here if, say, they had gone, they had investigated, and they had found on Mr. Would we be in a different situation if they had found on Mr. Hoover's computer 25 nudes, okay? But, and it showed that he was on the computer every day for an hour viewing these. But they turned, they were all classic works of art. Like an Aang or a statue done to tell his date or something like that. Where would we be then? In other words, showing more than is shown in these, yet viewed as classic works of art. I don't think that would be sexually explicit or sexually oriented, if that were the case. But that might still be misuse of government equipment. Oh, yeah. I mean, you could be misusing government equipment if you're on there as a citizen. You know, or just visiting innocent websites. Because you're doing that all day. Sure. But that's really, perhaps that is, in fact, the focus. It's really hard to tell what was the focus of the agency action. Because, in the first place, removal from service and then a lengthy suspension. Is your sense of the reason that this ought to be supported? Is that this was just not the business for which he was being paid? Whether it was a bird watcher, which is birds. He spent a certain amount of time studying the birds each day. It's a little bit of both, I think. But the agency's, the pictures that he was looking at, the material that he was looking at, certainly fits the role. The agency has a zero tolerance policy for material dissection. Doing this kind of stuff, looking at material of a sexual nature. This kind of material clearly affects the efficiency of the service. And required Mr. Rodriguez, one of his supervisors, to go and talk to his other supervisor. But the key here is, I think, that it be sexually explicit or sexually oriented. I mean, he wasn't punished because of the length of time he was on his computer. It was what he was viewing. That's correct. He was charged with viewing. So the lynchpin is that it be sexually explicit or sexually oriented. Or sexually oriented. And the court can decide whether or not these photographs, and certainly some of them, are very clearly sexually oriented. I mean, it's a judgment call. I recognize that. But Mr. Endicott said that he scrolled through all of this so speedily. He was just reading his mail. And is that a factor? Is there any dispute? Right. As to how many seconds were spent? There's no dispute about the overall amount of time here. But we certainly dispute Mr. Hoover's contention, Mr. Hoover's characterization of this as inadvertent. He received an email. This is in the record. It's in our brief. He received an email from his friend. That email contained a link to a website about motorcycles. He clicked on that link, not on any attachments to the email. He clicked on a link in the email. That link led him to a website. That website was concerned with motorcycles. On that website, there was another link. That link consisted of a picture of a scantily clad woman. Mr. Hoover clicked on that link, which took him to more pictures of a scantily clad woman. He did this once. He did it, however briefly, for a couple of minutes on December 4th. He scrolled through five or six pages by his own admission. He then came back the next day and looked at, when I say the same images, I don't know if it was exactly the same pictures, but he looked at a website that had very similar pictures on it. Let me focus in on the return visit. You make reference to that. I think I read the language. Was this the same material on the same website? What is the nature of this? The argument that he came back and revisited material previously viewed would seem to be inconsistent with the contention that he was simply inadvertently exposed to these materials and then moved on, so it's important to focus in on exactly what it is that he revisited, if any. It is inconsistent. If you look at page 30 and 31 of the joint appendix here, this is actually the log of what Mr. Hoover looked at. You can see here the date. There's two date columns, the middle date column on page 31. It says 12-05-03. That's the date that he was looking at this stuff here. When you look at the URL, it's bertot.com slash festival one. You can see these are JPEGs, these are photographs. Then if you look over here on page 30, the date here is the second date, 12-04, again right around lunchtime. If you look at the JPEGs, the URLs here, it's 03Fest66JPEG, 03Fest65. Just looking at them, the JPEG, the name of the photographs is very similar. In the record, these photographs here on the second day, I think, are contained in our supplemental appendix. Well, I'm not sure. The URL is kind of different between the one you called out on 12-04 at the top of 31. That's correct, John. The URL on page 30 is bigeasychoppers.com. Right. The other is bertot.com. Bertot.com. But the photographs are the same. How would we know that? You're not changing. If we look at the supplemental appendix, if you're willing to, on page 83, I'm looking at it as it begins. You can actually cross-reference. On page 80, for example, 03Fest30, 03Fest82, they match up. Did James' images have been saved on his computer, or were they obtained by going on the same motorcycle site and following through? They were obtained by going back onto the Internet. He did not save the images on his computer. The images were saved automatically in the temporary Internet. That's something that happens automatically. That's something that happens automatically. There are a few other pictures that he saved deliberately that he received from other employees and from his friends. But the deliberate part here is that he clicked on a link and went to the website. So you don't really know if all of these were viewed? We know that these were viewed. The temporary Internet files folder records when you go. The expert testified to this. When you go and look at a photograph, the temporary Internet files record that you've looked at these photographs. And Mr. Herbert did not dispute that. He looked at all of these photographs. What was the total amount of time that he spent viewing these images, apart from when they initially came? I mean, everyone would agree. It seems to be the case that if someone sends you an email, you open it, you view it, and that's the last of it, you wouldn't hold that against him, right? If someone says to you, yes, I think that's true. If you inadvertently just open it. So taking that aside, what was the total amount of time he spent? I think it was less than five minutes. We don't dispute the time. Because the time here shows for many of these that three or four images were viewed in one second. Very quickly, yes. So maybe he was looking to save it for an experience. I think it's incredible. I think that it's not believable that Mr. Hoover clicked on a link on a scantily clad room looking for birds or anything other than a scantily clad room. And you have to look at what Mr. Hoover's position in the agency was. He is the GS-13 information specialist in charge of the entire region's information technology. He's a resource for employees in his region for rules of information technology and procedures. He should have known better. And as the deciding official found here, he was evasive after he was caught. He was evasive about what exactly he was doing. He showed no remorse for what he had done. And he had also been warned previously about misusing his computer. So all of that adds up. He was a GS-13. Most GS-13s are supervisors. I don't know that he was a supervisor. I think he was more... There's nothing in the record that shows he was a supervisor. He was a technical person, but not necessarily a supervisor. Yeah, he was more of a regional resource, I think. That really goes to the penalty, doesn't it? That goes to the penalty, and I want to touch upon that, because the penalty here, the 60-day suspension, was entirely reasonable. He was, at first, his supervisor proposed to... Would you agree, Mr. Fentner, that the removal was too onerous a penalty and that the agency, the deciding official, properly reduced it? I'm not sure I'm willing to concede that, but... You think that was appropriate? I think that given Mr. Hooper's position in the agency, given the fact that he went back that second day and looked at these photographs, that removal... No, but you don't think it was inappropriate to reduce the penalty? No, no, absolutely not. I mean, that was the... As the Court knows, the penalty determinations are within the sound discretion of the agency, and the agency knows what's best for managing its employees, and that mitigation was entirely reasonable. And the ultimate 60-day penalty was certainly not an abuse of the agency's discretion, given everything that we've talked about. Again, his supervisor pointed out clearly that his position was one of trust and independence, and the agency had a zero-tolerance policy for actions of this kind. The other... The Farrell case Mr. Andercott touched upon briefly... Mr. Madden, one thing I didn't know is that in the regulation, there's a provision that said that if you turn on your computer and you get an e-mail, and you open an attachment, and there's inappropriate material, and you view it by the state, you should go and report that? You should go to your supervisor. Isn't that a little bit unrealistic? I mean, is it a practical matter? Do you see somebody doing that? They get an e-mail. Say somebody sends them a... A friend sends them an e-mail, and there's an attachment. They open the attachment, and then they think it's inappropriate. They delete it, and that's the end of it. I mean, are they, under those circumstances, bound to go and report that? Isn't that a little... You know, looking man-to-man here, isn't that kind of a little bit... Or spam. Spam sure often comes with that, either in the message or in attachments, all sorts of stuff. Isn't that kind of an unrealistic burden to put on an individual to go and do that under those circumstances? Well, I don't know. Wouldn't somebody maybe feel sort of foolish doing that? Say, running to the supervisor and saying, oh, gosh, you know, look what happened. Well, I think you're right. Apart from this case. Sure. Apart from this case. It probably wouldn't happen, but, you know, men must turn square corners when they deal with the government, and being prudent is always... But you have suggested someone should be punished if they got this kind of material by mistake. They immediately turned it off, didn't go to their supervisor. I think that would be a different case, and they probably shouldn't be punished. I would just like to point out one... I would just like to point it out that on page 16, I have a quote here from the Carousel case. That quote did not come from the Carousel case. It came from the Morrison case. I just wanted to alert the court to that mistake. The Carousel case does support our position, certainly, but this quote is a misquote. Thank you, Mr. Mayor. Thank you. Mr. Mayor, by the way, I apologize. I think I... At one point in your argument, I figured it was Mr. O'Connor. My apologies. Mr. Indica? Thank you, ma'am. The scientific evidence clearly before the board in Dallas was that, as shown on pages 28 and 30, the initial viewing on December the 24th came from Big Easy Choppers. The viewing on December the 5th, the next day, shown as Appendix 31, is Barron. That was the evidence presented by the Inspector General, a technical expert, and that was his law as he produced out of that computer. I don't think that's an issue before us. If the wrong information was presented to the board, that, in fact, was the evidence that was presented and how it was presented. The total amount of time, again, taken from the computer logs was that, at most, Mr. Hoover viewed these pictures for 103 seconds or a minute and some seconds. It's not five minutes. It's 103 seconds. Again, the scientific evidence does not support Mr. Rodriguez. If it showed Mr. Hoover watching these pictures, why then, in the morning, did it not show Mr. Hoover watching these pictures? Because he didn't. We think the standards as discussed here today with the United States saying, well, it's a judgment call, with the Farrell case saying, use some common sense, folks. The Department of Labor policy, which ultimately is what Mr. Hoover's penalty is based on, says the sexual nature, the creation, download, viewing, storage, copying, or transmission of sexually explicit or sexually coordinated materials without further definition of what those mean. For those of us privileged to have law training, that might mean something to us. To the layperson who does not have that training, it may not mean what we think it means. We urge that Mr. Hoover was entitled to a lesser penalty than he received in this case. We would urge that the judge made a credibility finding that was erroneous as to Mr. Rodriguez and that the standards she used were not in accordance with law and regulation by any definition of sexually oriented or sexually explicit. Thank you.